**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **MICHAEL HOLDER, JR. and HEATHER WILLIAMS, Individually and as Administrators of the Estate of Michael Karl Holder, deceased,**<br><br>Plaintiffs,<br><br>v.<br><br>**WILFREDO SUAREZ, Individually, *et al.*,**<br><br>Defendants. | CIVIL ACTION NO. 3:CV-14-1789<br><br>(JUDGE CAPUTO) |

## MEMORANDUM

Presently before me are Defendants Wilfredo Suarez, individually; Wilfredo Suarez d/b/a Suarez Trucking, LLC; Evans Delivery Company, Inc.; and Evans Delivery Company, Inc. d/b/a All Points Transportation's Motion for Partial Summary Judgment (Doc. 31) and Defendant, Interpool Inc., d/b/a Trac Intermodal's Motion for Summary Judgment (Doc. 33). Because genuine issues of material fact remain with regard to liability on behalf of Defendants Wilfredo Suarez, individually; Wilfredo Suarez d/b/a Suarez Trucking, LLC; Evans Delivery Company, Inc.; and Evans Delivery Company, Inc. d/b/a All Points Transportation, the motion for partial summary judgment will be denied. However, because there are no disputes as to any issues of material fact and Interpool Inc., d/b/a Trac Intermodal is entitled to judgment as a matter of law, its motion will be granted.

## I. Background[1]

### A.    Factual and Procedural Background

Plaintiffs Michael Holder, Jr. and Heather Williams, individually and as Administrators of the Estate of Michael K. Holder, deceased (collectively "Plaintiffs"), commenced this wrongful death and survival action in September 2014 against Wilfredo Suarez, individually ("Suarez"); Wilfredo Suarez d/b/a Suarez Trucking, LLC ("Suarez Trucking"); Evans Delivery Company, Inc. ("Evans"); Evans Delivery Company, Inc. d/b/a All Points Transportation ("All

---

[1]    I refer to the Defendants' statements of facts, without also referring to Plaintiffs' Counter-statements only when facts are admitted, or deemed admitted, by Plaintiffs.

Points"); and Interpool, Inc. d/b/a Trac Intermodal ("Trac") (collectively "Defendants"). (*Am. Compl.*) The action relates to an accident that occurred on Interstate 80 in Mercer County, Pennsylvania on April 10, 2013 involving an automobile driven by Michael K. Holder and a tractor-trailer driven by Wilfredo Suarez. (*Defendants' Concise Statement of Material Facts "Defs. Concise",* Doc. 31, ¶¶ 1, 4.)  Michael K. Holder died as a result. (*Defs. Concise*, ¶ 5.)

On April 10, 2013, at approximately 3:00 am, Suarez was driving a 2004 Freightliner tractor, owned by him, and pulling an intermodal trailer chassis, leased by Evans from Trac, on Interstate 80 Westbound. (*Defs. Concise*, ¶ 1; *Trac's Statement of Uncontested Facts "Trac's Statement"*, ¶¶ 2-3.) Near the interchange of Interstate 80 Westbound and Interstate 79, the right-rear inside tire on the last axle of the chassis became flat. (*Defs. Concise*, ¶ 2; *Plaintiffs' Answer, Concise Statement of Material Facts "Pltfs. Concise"*, Doc. 39, ¶ 2.) Suarez pulled over and inspected the tires and the flat tire, activated his hazard lights and decided to drive to the truck stop he had passed approximately ten (10) minutes prior. (*Defs. Concise*, ¶ 3.) Plaintiffs deny that Suarez activated his hazard lights and independently decided to drive to the truck stop. (*Pltfs. Concise*, ¶ 3.) Suarez exited Interstate 80 Westbound, turned around and began to proceed on Interstate 80 Eastbound. (*Am. Compl.* ¶ 28; *Defendants' Answer and Affirmative Defenses*, *"Defs' Ans.",* ¶ 28.)  At approximately 3:30 am, Michael Karl Holder's vehicle collided with the back of Suarez's truck. (*Defs. Concise*, ¶¶ 4-5; *Pltfs. Concise*, ¶¶ 4-5.)

At the time of the collision, and as admitted for purposes of the pleadings, Suarez was an employee of Evans and was acting in the scope of his employment. (*Defs. Concise*, ¶ 24.) Suarez was hired through an agent, Mr. Joseph Fiorica. (*Defs' Brief,* 8.) Mr. Fiorica initially vetted drivers to ensure that the driver had two years experience and no significant accident within five years. (*Id.*) The driver's application was then sent to Evans. (*Id.*) If Evans hired the driver, the driver would return to Mr. Fiorica and sign a lease. (*Id.*) Mr. Fiorica would then complete a visual inspection of the vehicle and ensure that the lights and brakes were operational and that the tires were roadworthy. (*Id.*) Mr. Fiorica would also ensure drivers were federally inspected, while Evans would complete background checks,

motor vehicle reports, and medical and criminal background checks. (*Id.*)

The chassis being hauled by Suarez on April 10, 2013, was leased and/or interchanged by Evans from Trac. (*Trac's Statement*, ¶ 3.) Trac is in the business of leasing intermodal transportation equipment, including chassis. (*Id.* at ¶ 1.) Evans and Trac had an Equipment Interchange Agreement ("EIA"), which was used for short term chassis rentals. (*Id.* at ¶ 4.) On April 5, 2013, Evans sent one of its drivers to pick up a container of cargo at Global Marine Terminal ("Global Terminal"). (*Id.* at ¶ 5.) Upon entering Global Terminal, the driver selects an appropriate chassis from the pool in the terminal. (*Id.* at ¶ 6.) After selecting a chassis, the driver is required to inspect and ensure that the chassis complies with the Federal Motor Carrier Safety Act regulations ("FMCSR") and the Uniform Intermodal Interchange & Facilities Access Agreement's ("UIIA") pre-trip inspection guidelines. (*Id.* at 9.; Doc. 33-4, ¶ 2.) The driver is also to check that the chassis meets the reflector requirements, and confirm that the lights are working by connecting the tractor to the chassis, because the chassis does not have an independent source of power. (*Trac's Statement*, ¶¶ 10-11; *Plaintiffs' Response "Pltfs' Response"* Doc. 37, ¶¶ 10-11.) The driver is required to reject any chassis that is not roadable pursuant to the FMCSR and the EIA. (*Trac's Statement,* ¶ 12.)[2] Plaintiffs contend that Trac was required to perform the inspections, maintenance and repairs, however, Trac alleges that its personnel do not inspect the chassis, but the inspections are done by the selecting driver as well as the Global Terminal personnel or third party vendors. (*Pltfs' Response*, ¶¶ 7-8; *Trac's Statement*, ¶¶ 7-8.)

After selecting a chassis, the terminal personnel place the cargo container on the chassis and the driver proceeds to the security gate where the terminal mechanic does another inspection to check for defects. (*Trac's Statement,* ¶ 14 *Pltfs' Response*, ¶ 14.) The

---

[2]

Trac contends that if a driver selects a chassis, that is conclusive evidence that the chassis is roadable and in compliance with all FMSCR requirements. (*Trac's Statement,* ¶ 12; *Pltfs' Response*, ¶ 12.)

driver is required to put on his lights, step on the brake, etc. and if any repairs are needed, the driver is sent to the roadability lane for repairs to lights, tape, tire change, etc. (*Id.*) No chassis is allowed out of the terminal unless the mechanic finds it roadable. (*Id.* at ¶ 15.) When a chassis enters or leaves the terminal, a Trailer Interchange Receipt ("TIR") is generated and is to note any dents, scratches or other defects. (*Id.* at ¶¶ 16-17.)

On April 5, 2013, the chassis that was eventually driven by Suarez, was outgated to Evans at 12:34 pm and the outbound TIR does not indicate any damage. (*Id.* at ¶¶ 18-19.) The chassis and container were then stored in Evans' yard in Newark, New Jersey until April 9, 2013 when it was assigned to Suarez to be delivered to Campbell's Soup in Napoleon, Ohio. (*Id.* at ¶¶ 20-21; Doc. 33-6, 9.) Suarez arrived at the yard around 10:00 pm on April 9, 2013 and performed a pre-trip inspection of the tractor and ensured the chassis was in good working condition.[3] (*Trac's Statement*, ¶¶ 22-23.) Suarez left Evans' yard around 11:00 pm on April 9. 2013. (*Id.* at ¶ 24.)

Plaintiffs allege Suarez was operating his tractor-trailer in a negligent, careless, gross, wanton and reckless manner, (*Defs. Concise*, ¶ 7.) by traveling at an unsafe speed below the speed limit; without rear lighting devices, brake lights and flashers; with flat tire(s); and in violation of Pennsylvania law and federal regulations. (*Id.* at ¶ 13.)

Following the accident, an investigation was conducted by the Pennsylvania State Police in Mercer County. (*Defs' Brief,* 7.) A crash report was issued and criminal charges were subsequently brought against Suarez for alleged violations of various statutes. (*Id.*)

On November 16, 2015, Defendants filed a motion for partial summary judgment and a brief in support, (Docs. 31-32) and move for summary judgment on Plaintiffs' claims for punitive damages against both Suarez and Evans and on Plaintiffs' claims against Evans alleging negligent entrustment/hiring and independent corporate negligence. (*Id.*) Plaintiffs filed a brief in opposition to the motion for partial summary judgment and an answer to the

---

[3]

Plaintiffs deny the averment and cites to the opinion of one of their experts as support for their denial.

statement of facts on December 7 , 2015. (Docs. 39-40) Trac filed a motion for summary judgment and a brief in support on November 16, 2015, requesting summary judgment on all of Plaintiffs' claims against it. (Docs. 34-35) Plaintiffs filed a timely answer to the statement of facts and a brief in opposition to Trac's motion for summary judgment. (Docs. 37-38.)  Both motions are now ripe for disposition.

### B.    Legal Standard

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "Summary judgment is appropriate when 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Wright v. Corning*, 679 F.3d 101, 103 (3d Cir. 2012) (quoting *Orsatti v. N.J. State Police*, 71 F.3d 480, 482 (3d Cir. 1995)).  A fact is material if proof of its existence or nonexistence might affect the outcome of the suit under the applicable substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

Where there is no material fact in dispute, the moving party need only establish that it is entitled to judgment as a matter of law. *See Edelman v. Comm'r of Soc. Sec.*, 83 F.3d 68, 70 (3d Cir. 1996).  Where, however, there is a disputed issue of material fact, summary judgment is appropriate only if the factual dispute is not a genuine one. *Anderson*, 477 U.S. at 248, 106 S. Ct. 2505.  An issue of material fact is genuine if "a reasonable jury could return a verdict for the nonmoving party." *Id*.  Where there is a material fact in dispute, the moving party has the initial burden of proving that: (1) there is no genuine issue of material fact; and (2) the moving party is entitled to judgment as a matter of law. *See Howard Hess Denal Labs., Inc. v. Dentsply Int'l, Inc.*, 602 F.3d 237, 251 (3d Cir. 2010).  The moving party may present its own evidence or, where the non-moving party has the burden of proof, simply point out to the court that "the non-moving party has failed to make a sufficient showing on an essential element of her case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323,

106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).

"When considering whether there exist genuine issues of material fact, the court is required to examine the evidence of record in the light most favorable to the party opposing summary judgment, and resolve all reasonable inferences in that party's favor." *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007). Once the moving party has satisfied its initial burden, the burden shifts to the non-moving party to either present affirmative evidence supporting its version of the material facts or to refute the moving party's contention that the facts entitle it to judgment as a matter of law. *Anderson*, 477 U.S. at 256-57, 106 S. Ct. 2505. The Court need not accept mere conclusory allegations, whether they are made in the complaint or a sworn statement. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888, 110 S. Ct. 3177, 111 L. Ed. 2d 695 (1990).

"To prevail on a motion for summary judgment, the non-moving party must show specific facts such that a reasonable jury could find in that party's favor, thereby establishing a genuine issue of fact for trial." *Galli v. New Jersey Meadowlands Comm'n*, 490 F.3d 265, 270 (3d Cir. 2007) (citing Fed. R. Civ. P. 56(e)). "While the evidence that the non-moving party presents may be either direct or circumstantial, and need not be as great as a preponderance, the evidence must be more than a scintilla." *Id*. (quoting *Hugh v. Butler County Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005)). In deciding a motion for summary judgment, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249, 106 S. Ct. 2505.

This case is before me as a diversity action pursuant to 28 U.S.C. § 1332. "A federal court sitting in diversity must apply state substantive law and federal procedural law." *Liggon-Redding v. Estate of Sugarman*, 659 F.3d 258, 262 (3d Cir. 2011) (citing *Erie R.R. v. Tompkins,* 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938)). Defendants assert that Pennsylvania law applies to the punitive damages and negligence claims (Doc. 32, 10.) and Plaintiffs do not contest their assertion.

## II. Discussion

### A.    Defendants' Motion for Partial Summary Judgment[4]

Defendants[5] seek summary judgment on Plaintiffs' punitive damages claims. The Pennsylvania Supreme Court has stated that punitive damages "may be awarded for conduct that is outrageous, because of defendant's evil motive or his reckless indifference to the rights of others," and because punitive damages are penal in nature, they "are proper only in cases where the defendant's actions are so outrageous as to demonstrate willful, wanton, or reckless conduct." *Hutchison ex rel. Hutchison v. Luddy,* 582 Pa. 114, 870 A.2d 766, 770 (2005) "Punitive damages may be awarded in Pennsylvania for reckless conduct,—that is, conduct less culpable than intentional or willful action," because "as the *Hutchison* court implicitly acknowledged," "[a] plaintiff can sue for negligence and prove recklessness, yet still be unable to prove intent." *Brand Mktg. Grp. LLC v. Intertek Testing Servs., N.A., Inc*., 801 F.3d 347, 359 (3d Cir. 2015) (citing *Hutchison,* 870 A.2d at 770–72).Therefore, "punitive damages may be awarded in negligence cases if the plaintiff proves greater culpability than ordinary negligence at trial," because there is nothing in "in law or logic to prevent the plaintiff in a case sounding in negligence from undertaking the additional burden of attempting to prove ... that the defendant's conduct not only was negligent but that the conduct was also outrageous,' such that it warrants punitive damages." *Brand Mktg. Grp.*, 801 F.3d at 358 (citing *Hutchison,* 870 A.2d at 772-73 ). "Punitive damages will be imposed where the defendant knew or had reason to know of facts which create a high degree of risk of physical harm to another, and deliberately

---

[4]

The Amended Complaint is comprised of ten (10) counts. (Doc. 5.) The Motion for Partial Summary Judgment does not seek summary judgment on the negligence claims against Suarez in Counts I through IV. Therefore, those claims remain.

[5]

For purposes of Section II.A., references to "Defendants" includes Suarez, Suarez Trucking, Evans and All Points collectively, unless otherwise stated.

proceeded to act, or failed to act, in conscious disregard of, or indifference to, that risk." *Hutchison*, 870 A. 2d. at 771 n.7.

Defendants contend Plaintiffs have failed to establish facts beyond negligence and therefore, Plaintiffs' demands for punitive damages are inappropriate as to all Defendants.

### 1.   *Suarez*

Suarez contends that there is no evidence to demonstrate his state of mind was evil. (Doc. 32, 11.) Although it is Plaintiffs' contention that there are ample facts in dispute for the jury to find Suarez had the requisite state of mind, they do not allege that Suarez's actions were done with an evil state of mind but rather with reckless indifference. (Doc. 40, 16.) Suarez acknowledges that punitive damages can be awarded if Plaintiffs establish that he was recklessly indifferent to the rights of Plaintiffs' Decedent, however, Suarez argues there is no evidence indicating that he was "consciously aware or appreciated the risk for the fatal injuries suffered by Plaintiffs' Decedent at the time the accident occurred." (Doc. 32, 15.) Plaintiffs counter that the evidence clearly shows that Suarez acted with reckless disregard for the rights of others, including the decedent. (Doc. 40, 19.)  Plaintiffs cites to Suarez's guilty plea to reckless driving under 75 Pa. C.S.A. 3736(a)[6] (*Id.* at 17.); alleged failure to have proper illumination (*Id.* at 20.); alleged travel at a dangerously slow speed on a flat tire (*Id.* at  25.); and alleged violation of numerous Pennsylvania laws and federal regulations (*Id.* at 17.). The issue is if there is an genuine dispute regarding those facts that could possibly lead a jury to conclude that Suarez "knew or had reason to know of facts which create a high degree of risk of physical harm to another, and deliberately proceeded to act, or failed to act, in conscious disregard of, or indifference to, that risk." *See Hutchison*, 870 A. 2d. At 771 n.7.

Defendants argue that Pennsylvania has adopted a very strict interpretation of

---

[6]

   **"(a) General rule.--**Any person who drives any vehicle in willful or wanton disregard for the safety of persons or property is guilty of reckless driving." 75 Pa. C.S.A. § 3736.

"reckless indifference to the rights of others." (Doc. 32, 11(citing *Burke v. Massen*, 904 F. 2d 178, 181 (3d Cir. 1990)). In *Burke*, the Third Circuit overturned punitive damages awarded by a jury where the driver of a tractor trailer, who had falsified his employment application and was driving in excess of the federally allowable hours, fell asleep at the wheel while speeding, drifted into the shoulder, and struck and killed the decedent. 904 F. 2d at 183. The court emphasized that there "must be some evidence that the person actually realized the risk and acted in conscious disregard or indifference to it," and that the evidence at trial did not demonstrate that the driver consciously appreciated the risk. *Id.* at 182, 183. Defendants also cite to *Burke v. TransAm Trucking*, 605 F. Supp. 2d 647 (M.D. Pa., Mar. 31, 2009). (Doc. 32, 12-13.) In *TransAm*, the driver was alleged to have been traveling twenty miles an hour over the speed limit in a tractor trailer while approaching a "blind" curve. 605 F. Supp. 2d at 655.  The court determined that because a jury could find that the driver consciously appreciated the risk of harm that could result from such conduct based on the driver's training and experience,  the defendant's request for partial summary judgment was denied on punitive damages claims. *Id.* Defendants contend that the current case is distinguishable because, unlike in *TransAm*, the allegations of Suarez's conduct do not rise "to the level of outrageous conduct, a conscious appreciation or disregard of any risk, or reveal [the] culpable state of mind required." (Doc. 32, 13.)

Plaintiffs cite to several cases in support of their position. First, they state that *Came v. Micou,* 2005 WL 1500978 (M.D.Pa., June 23, 2005), stands for the proposition that when applying Pennsylvania law, courts "have found that a knowing violation of the Federal Motor Carrier Safety Regulations can constitute a 'reckless indifference to the rights of others.'" (Doc. 40, 18 (citing *Came*, 2005 WL 1500978 at *5.)) In *Came*, the plaintiff presented evidence of alleged violations of federal regulations and an expert report that indicated that the defendant driver had momentarily fallen asleep, but the defendant's expert report contradicted the findings, so the court denied summary judgment on the punitive damages claim. 2005 WL  1500978 at *5. Also, Plaintiffs cite to *Randazzo v. Grandy,* 2011 WL

1811221 (M.D.Pa., May 12, 2011). In *Randazzo*, the court held there were disputed issues of material fact with regard to whether the truck driver's actions in backing up into another vehicle resulting in injury to the occupant, in light of evidence that other motorists were beeping their horns, "could be found by a fact finder to be wanton and recklessly indifferent to the safety and well-being of" the plaintiff and denied summary judgment. *Id.* at *8.

Turning to the current case, the appropriateness of a punitive damages award is based on the facts and circumstances of the case. *See Hutchison*, 780 A. 2d at 772. Plaintiffs argue that summary judgment is inappropriate because as a professional truck driver, Suarez was or should have been aware of the FMCSR and that the regulations were implemented to ensure the safety of the traveling public, and yet operated a tractor trailer at "a dangerously slow speed, with two flat tires, and without functioning tail and hazard lights with a load weighing 58,000 pounds." (Doc. 40, 19-20.)

First, Plaintiffs argue that Suarez's entry of a guilty plea to criminal charges purportedly arising out of the accident is an admission that he was reckless in the operation of his truck on April 10, 2013. (Doc. 40, 17.) Defendants counter that although a guilty plea may be admitted in some circumstances, in the current case, the criminal complaint is devoid of a factual basis, and that, even presuming the reckless driving charge was based on inoperable lights, there is nothing in the charges that show Suarez "knew the lights were inoperable at the time of the accident," and "the possible fact that the lights were inoperable and whether or not Mr. Suarez was aware" of such "are two different propositions." (Doc. 42, 4-5.) "It is the general rule that a plea of guilty to a charge of reckless driving is an admission against interest, and evidence thereof is admissible in an action for personal injuries based upon the same facts and circumstances from which the charge arose." *Rain v. Pavkov*, 357 F.2d 506, 509 (3d Cir. 1966); *see also Eschelbach v. William S. Scull Co.*, 293 F. 2d 599, 603 (3d.Cir. 1961)(a plea of guilty to a traffic summons which arose out of the same facts and circumstances as those in a civil case was admissible despite only listing the charge on the summons challenged as being "not at all clear or definite" as to

what the defendant was alleged to have pleaded guilty to); *Allen v.* Fletcher, 2009 WL 3103828 (M.D. Pa. Sept. 24, 2009); *Grosek v. Panther Transp., Inc.*, No. 3:07CV1592, 2009 WL 905035, at *5 (M.D. Pa. Apr. 1, 2009). At this stage, without a challenge to admissibility, the guilty plea could potentially be admitted at trial as a statement against Suarez's interest.

Turning more specifically to the truck's lighting, the parties differ on what is believed to be the material fact upon which a punitive damages claim could be based. Plaintiffs rely on the testimony of Mr. William Danch, who witnessed the accident, and states that he only saw one dim light on the rear of the truck. (Doc. 40-7, 23-24.) Plaintiffs also rely heavily on the modification made to a plug on Suarez's truck. Suarez testifies that he modified the truck's electrical system by placing a jumper wire on his wiring harness. (Doc. 42, 7; Doc. 42-1, 4.)  The parties' experts differ on whether the plug was or was not operational upon inspection of the truck after the accident. They do all agree, however, that the plug was necessary to provide electricity to the chassis and therefore, power the chassis's lights.

Defendants argue that there is no evidence to demonstrate that Suarez was aware that one of more of his lights may not have been operating properly and contends that their expert states testing done after the accident showed that the plug was working properly. (Doc. 42, 7.) Mr. Greg Sullenberger inspected the wiring harness and checked each pin for proper voltage. (Doc. 42-4, 16.)  Mr. Sullenberger's tests revealed that the pins "produced the proper voltage." (*Id.*) He also tested the Trac chassis with a truck different from Suarez's and the lights on the Trac chassis worked when connected to a truck other than Suarez's. (Doc. 42-4, 11.) Defendants also rely on the  the Crash Investigation report, that states that "[w]hile traveling eastbound on flat tires, the tires began to deteriorate disabling all but one of the rear trailer lights," (Doc. 40-2, 5.) to argue there is no evidence that Suarez knew he was operating the truck without working lights. (Doc. 42, 8.)

In support of their position, Plaintiffs provide expert reports from three separate individuals that state the plug was not providing an adequate source of power to the chassis. (Docs. 40-5; 40-8; 40-14.) Mr. Kevin Johnson opines in his Accident Reconstruct

Report that Suarez had knowledge of a defect in his truck's electrical system and he failed to properly repair the vehicle. (Doc. 40-5, 14.) Dr. Christopher G. Shapley, states, in his opinion, "the use of a modified plug shows that Mr. Suarez knew that his truck was not making reliable electrical connection with the trailers he was towing." (Doc. 40-8, 2.)  Mr. Whitney G. Morgan relies on the "standards established for CDL drivers" and enumerated in the federal regulations as well as in the Commercial Driver's License Manual to formulate his opinion. (Doc. 40-14, 7. ) Mr. Morgan states that '[t]he fact that Mr. Suarez was using a jump wire to assist in the brightness of his lights, is evidence that he knew of a defect to his electrical connection, yet chose to use a jump wire instead of getting his [commercial motor vehicle] repaired," and such is evidence he "knew of a defect and disregarded it." (Doc. 40-14, 14.)

Suarez testifies during his deposition that he placed the jumper wire in the connector plug. (Doc. 40-3, 13.) The parties dispute the character of the exchange, however, the testimony was as follows:

> Ms. Munley: All right. What is that showing us?
>
> Suarez: The same–the same plug–with the wire.
>
> Ms. Munley: All right. Were parts of the – were – some of the plugs in there, were they not working?
>
> Suarez: All is working.
>
> Ms. Munley: Okay. So when would you have to put the wire in – why did you need the wire in there to make it more bright?
>
> Suarez: More bright, because they missing ground.
>
> Ms. Munley: When you say they're missing ground, what do you mean?
>
> Suarez: When you plug the – the trailers, the lights is– is not clearly, but it's the light on. So you put the ground, its going to be more brightness.
>
> Ms. Munley: Well, why would the lights not be –why –
>
> Suarez: Clearly? Because they're missing ground.
>
> . . .
>
> Ms. Munley: All right, so they're –they're not working properly?
>
> Suarez: They're not working properly. So put in this wire, it's going to be

working properly, some more lighted, more brightness.

Ms. Munley: And is there a reason why you didn't get a new plug instead of putting the wire in?

Suarez: It's better to get a new plug – or cord. With the wires, it's worked. If it's work, I –when the other things work, I replace it.

Ms. Munley: How much does a –how much does a plug cost?

Suarez: 150.

. . .

Ms. Munley: A ground. Okay. Would –would you need the ground if the plug was functioning correctly?

Suarez: No.

. . .

Ms. Munley: I got it. Okay. So –okay. How did you – how did – how did you know that you needed to put a ground in? Like--

Jumper.

Jumper?

Ms. Munley: Is that what it's called, a jumper?

Suarez: Yeah, jumper or ground.

Ms. Munley: All right. How did you know that you needed to put the jumper or ground in?

Suarez: When you plug the container and then you– you don't see the lights go brightness. So a little low. So you put a jumper, and the lights show more lights.

. . .

Ms. Munley: Okay. So there –so there's no electricity getting to the lights?

Suarez: Electricity. Yes, it's get electricity, but a poor electricity.

Ms. Munley: Poor electricity. Okay. And so what's the reason for the poor electricity?

Suarez: What is the reason? Because these holes, they got metal connectors. You put in a day and pull it out, put it in a day and pull it out, this little metal is going to be expanded, expanded. So when this is expanded, it don't catching well. So you put a little metal–little wire to jump the ground to get a well connection.

Ms. Munley: And is that–is that something that they – they taught you at Evans, to do that?

Suarez: No.

Ms. Munley: How did you know to do that?

Suarez: Experienced driver.

Ms. Munley: All right. Is that something that was done at Evans?

Suarez: No.

(Doc. 40-3, 10-15; 42-1. 4-5.) Defendants argue that Suarez was simply referring to an attempt to improve brightness, not that he was knowingly operating a truck with a defect. (Doc. 42, 7.) Defendants also refer to a statement provided from Mr. Glenn Miller (Doc. 42-3), in which Mr. Miller states that when he arrived after the accident, he saw a flashing light on the side of the trailer. Defendants argue this evidence provides support for Suarez's testimony that he turned on his hazard lights and believed them to be operating. (Doc. 42, 5.) However, in light of the testimony of Mr. Danch, and viewed in the light most favorable to Plaintiffs, a jury could determine that Suarez was operating his truck with inoperable lights. Additionally, viewing the above exchange in the light most favorable to Plaintiffs, a jury could conclude that Suarez knew that there was a potential that the plug could fail to provide adequate electricity to power the lights. The disputes of fact regarding Suarez's use of an extra wire in the plug cautions against the conclusion that summary judgment is appropriate at this time on Plaintiffs' punitive damages claims against Suarez. Therefore, summary judgment is inappropriate and will not be granted.

Plaintiffs advance other arguments to demonstrate what they allege is sufficient conduct for an award of punitive damages. Plaintiffs' expert Dr. Shapley contends that Suarez would have been able to see in his rearview mirrors that his hazard lights were inoperable and therefore, Suarez knew or should have known that he was driving a vehicle without proper lights. (Doc. 40, 23.)  Defendants argue, there is nothing in the record to support this contention and that Suarez testified that he turned on his hazard lights and that he saw the lights flashing inside of his vehicle. (Doc. 32, 16; Doc. 32-2, 3.) However, there is a dispute of material fact with regard to whether the hazard lights were operational at the time of the accident based on Mr. Danch's testimony stated above.

The remaining evidence, despite Plaintiffs' assertions that it demonstrates that Suarez had the requisite state of mind, is either not supported by record evidence or is immaterial to the current case with regard to their punitive damages claims against Suarez. Plaintiffs argue that the Suarez knew his lights were not working properly prior to the subject incident because he purportedly replaced the rear lights on the chassis after the accident. (Doc. 40, 23.) Plaintiffs rely on the statement in the crash report by Trooper Ulintz, that states "I returned to the scene and discovered that Suarez replaced the rear lights to the trailer even though I advised him not to. The broken lights were recovered and entered into evidence." (Doc. 40-2, 5.) Plaintiffs contend that Suarez's "conduct demonstrates that he was aware of a problem with the lights," however, I disagree. Even viewing this fact in the light most favorable to Plaintiffs, it does not demonstrate that Suarez had any knowledge prior to the accident, and therefore, is immaterial.

Additionally, Plaintiffs argue that Suarez knew or should have known that the lights on the trailer would have been of vital importance while driving at night on Interstate 80 when it was dark and where there is no artificial lighting. (Doc. 40, 19.) Mr. Danch's testimony was that there were overhead lights but that they were not turned on at the time (Doc. 40-7, 39.), but Defendants' expert calls attention to post-accident photos evidencing the presence of illuminated overhead lights (Doc. 42-1, 4-5, 8.). However, the presence or absence of overheard lighting is immaterial to Suarez's state of mind.

Finally, Plaintiffs argue that Suarez opted to drive the tractor trailer without operating hazard lights at a dangerously slow speed with two flat tires in violation of 49 C.F.R. § 393.75(a)(3)[7], instead of contacting a repair service and waiting for assistance. (Doc. 40,

---

[7]

"No motor vehicle shall be operated on any tire that—

(3) Is flat or has an audible leak, or
. . ."

49 C.F.R. § 393.75.

24-25.) There is however, no evidence of record to suggest that Defendant appreciated the risk of traveling at a low speed on the interstate.

It is clear that the Plaintiffs will have to meet a higher burden in order to be awarded punitive damages, because "in order for the jury to receive a charge on punitive damages the Court must first be satisfied that Plaintiffs presented sufficient evidence at trial for a reasonable fact finder to find Plaintiffs are entitled to punitive damages." *TransAm,* 605 F. Supp. 2d at 655. The focus of the punitive damages claim against Suarez must focus on his state of mind, *see Maya v. Chertok*, No. 1:15-CV-00484, 2015 WL 5254377, at *3 (M.D. Pa. Sept. 9, 2015) (citing *Feld v. Merriam*, 485 A.2d 742, 748 (Pa. 1984)) ("'The state of mind of the actor is vital' when determining whether to award punitive damages.") and Plaintiffs must establish that Suarez had the requisite subjective state of mind, not just what a reasonable person in Suarez's position would have or should have known. *See Hutchison,* 870 A. 2d at 771. At this stage, however, because there are disputed issues of fact, the Defendants' partial motion for summary judgment on Plaintiffs' punitive damages claims against Suarez will be denied.

### 2.    Evans

Evans seeks summary judgment on Plaintiffs' claims for punitive damages, negligent entrustment/hiring, and independent corporate negligence. (Doc. 31) The requests for relief are addressed below.

### a.    Punitive Damages

Evans acknowledges that it may be held vicariously liable for punitive damages if the jury determines that Suarez's conduct justifies such an award, however, it argues that Plaintiffs' amended complaint provides no factual basis for an independent award of punitive damages against it. (Doc. 32, 16-17.) Pennsylvania law provides that punitive damages can be imposed on an employer based entirely on an employee's conduct, even

without any direct evidence of misconduct by the employer, *Shiner v. Moriarty,* 706 A.2d 1228, 1240 (Pa.Super.1998), appeal denied, 556 Pa. 711, 729 A.2d 1130 (1998), and the employer "may be held vicariously liable for the punitive damages of its agents if the actions of the agent were 'clearly outrageous,' were committed during and within the scope of the [employee]'s duties, and were done with the intent to further the [employer]'s interests." *Loughman v. Consol-Pennsylvania Coal Co.*, 6 F.3d 88, 101 (3d Cir. 1993) (citing *Delahanty v. First Pa. Bank, N.A.,* 318 Pa.Super. 90, 464 A.2d 1243, 1264 (1983)). Evans argues that there is no factual basis for Plaintiffs' claims that Evans "failed to 'adequately instruct Wilfredo Suarez in the safe operation of a commercial motor vehicle and intermodal trailer chassis,' 'fail[ed] to adequately ascertain that Wilfredo Suarez lacked the ability to operate the commercial motor vehicle. . . ,' and permitt[ed] Defendant Suarez to operate the tractor trailer in violation of various federal regulations and motor vehicle statutes." (Doc. 32, 17.)

Evans contends that Suarez was hired through an agent, Joe Fiorica, who vetted the drivers and then visually inspected the driver's truck for roadworthiness. (Doc. 32, 17.) It also contends that after Evans conducted background checks, sought motor vehicle reports, and medical and criminal background checks, no information was found that would disqualify Suarez. (*Id.* at 18.) It argues that Plaintiffs allege nothing more than negligence, and, therefore, the punitive damages claim must be dismissed. (*Id.*) Plaintiffs counter Evans' argument by contending that Evans "received multiple warnings regarding Defendant Suarez's reckless driving, failure to adhere to the Federal Motor Carrier Safety Regulations, and improper and dangerous maintenance of his tractor" and despite that knowledge, allowed Suarez to operate "when it knew or should have known that he would do so in a manner likely to create a serious risk of harm to other motorist (sic)." (Doc. 40, 27.)

Plaintiffs cite to several FMCSR regulations and argue that both Suarez and Evans, as the employer, had an obligation to comply and ensure compliance with all regulations. (Doc. 40, 29-30.); *see e.g.,* 49 C.F.R. §§ 392.1; 392.7(a), (b); 390.3(e); 393.9; 396.3. Plaintiffs' expert Mr. Morgan states that Suarez's truck had several out-of service defects

and other equipment defects that should have been discovered by Suarez and Evans, including vehicle braking systems defects. (Doc. 40-14, 7.) Plaintiffs also argue that Evans was required to inspect Suarez's vehicle to ensure compliance, but it relied on Mr. Fiorica, who lacked mechanical training and adequate knowledge, to inspect drivers' vehicles. (Doc. 40, 30.) Plaintiffs contend that Evans knew or should have known that the electrical plug in Suarez's truck was insufficient because Suarez testified that his truck was in Evans' yard almost daily. (*Id.* at 41.)

Plaintiffs also contend that Evans not only knew that Suarez was operating his vehicle without operating tail and hazard lights, but also that Suarez was operating the vehicle with one flat tire, and that it knew the weight of the truck would shift creating additional danger. (Doc. 40, 32-33.) In support of their position, Plaintiffs argue that Evans' accident investigation report states that "Evans Defendants instructed [Suarez] to turn around and travel 15 miles to a service station." (*Id.* (citing Doc. 40-4, 1.))[8] Evans responds there is no evidence that anyone at Evans/All Point instructed Suarez to travel to the truck stop and that Plaintiffs' citation to Suarez's deposition testimony with regard to this issue is incomplete and the exchange that followed does not support their position. (Doc. 42, 2.) During the deposition, Suarez testifies both that he did and that he did not talk to anyone before the accident. (Doc. 42-1, 3.)[9] There is evidence of record that Mr. Fiorica also denies

---

[8]

Plaintiffs' additionally contend that Evans was going to make Suarez pay for a repair services, giving Suarez "an incentive to operate unsafely." (Doc. 40, 33.) However, Plaintiffs fail to cite to the record to support this assertion.

[9]

Ms. Munley: Did you call anyone to tell them you had a flat tire?
Suarez: I tried to call. I call, and nobody answer at that time.
Ms. Munley: Did you talk to person named Joe and tell them you had a flat tire?
Suarez: Then later, I talk to Joe; I got flat tire. You know, I report my–whatever happened.
Ms. Munley: How long–how long did it take you to get Joe on the phone?
Suarez: I don't remember how long.
. . .
Ms. Munley: Okay. Do you–did you speak to– you–did you speak to anyone at All Points when you were pulled over on Interstate 80 West?

speaking to Suarez prior to the accident. Relevant portions of his deposition testimony are as follows:

> Ms. Munley: All right. Did -- how did you learn about the accident, Mr. Fiorica?
>
> Mr. Fiorica: I heard about the accident -- the first was from an E-mail, I recall, from Debbie that was sent to me that she received a phone call from Wilfredo during the night, and I read that on my phone. I seen he had tried calling me several times. I didn't -- I couldn't -- I didn't pick up the phone. I was sleeping, whatever. It was at night, during the night. And I checked my E-mail, which is

---

Suarez: I don't remember. I don't remember if I speak–no.
Ms. Munley: Did someone from All Points tell you to turn around and go to the–to the TA station or the –the rest stop?
Suarez: Yes.
Ms. Munley: All right. Who was it from All Points that told you to do that?
Suarez: Joe Fiorica, but –Joe Fiorica. I think so.
Ms. Munley: All right. And did –when did Joe Fiorica tell you to do that? When you were still stopped on Interstate 80 westbound on the side of the road?
Suarez: I don't remember that.
Ms. Munley: All right. Well, would he have told you that before the accident?
Suarez: Before the accident? No. I don't remember, no
Ms. Munley: Well, he wouldn't have told you to turn around and go to the rest stop after the accident, right?
Suarez: No.
Ms. Munley: All right.
Suarez: After the accident, before the accident, hmm. Just what I remember is I called. I called. Nobody answer. I call. Nobody answer. Then I look in my paper. I call the safety department.
Ms. Munley: Did you get anyone when you called the safety department?
Suarez: Some lady.
MR. SIEGFRIED: Let's be clear.
Ms. Munley: Oh.
MR. SIEGFRIED: That's after the accident
Suarez: After the accident.
BY MS. MUNLEY:
Ms. Munley: I'm talking about before the accident. Before you got on Interstate 80 eastbound, did you speak to anyone from All Points?
Suarez: No.
Ms. Munley: Did you tell the police that you–you talked to someone from all Points and the told you to turn around and to a rest stop?
Suarez: I don't remember.
. . .
(Doc. 40-3, 6-8; Doc. 42-1, 3.)

normal, and I seen that an incident had occurred.

Ms. Munley: Okay. Now, did Mr. -- did Mr. Suarez ever call you from the road and tell you that he was pulled over on the interstate highway with a flat tire?

Mr. Fiorica:  I seen he tried calling me several times. I don't know where he was or in respect to what had happened.

Ms. Munley: Okay. And did he -- did Mr. Suarez ever actually reach you and tell you that he was pulled over on the roadway with a flat tire?

Mr. Fiorica:  No.

Ms. Munley: All right. And are you aware that Mr. Suarez told the police that he had talked to you before the accident?

MR. SIEGFRIED: Object to the form. That's her statement.

Mr. Fiorica:  I'm not aware

Ms. Munley: All right. Did you ever tell Mr. Suarez to travel on the interstate highway with a flat tire for ten miles to get to a truck stop?

Mr. Fiorica:  No.

(Doc. 40-15, 64-66.) Further, Suarez's phone log does not support Plaintiffs' position that Suarez contacted Evans prior to the accident because the first call of April 10, 2013 was initiated at 3:33 am, the time of the accident. (Doc. 42-2, 5.) However, because I am not to weigh the evidence, the testimonial contradictions and the statement contained in Evans' investigation report, lead me to conclude there is a dispute of material fact regarding whether Suarez was told to turn around and travel to the truck stop. A jury, if Plaintiffs' contention is credited, could find that Evans' conduct was reckless and, therefore, summary judgment on Plaintiffs' claims for punitive damages against Evans is not appropriate at this time.

However, the remainder of Plaintiffs' purported evidence does not provide support for their position that the punitive damages claim should go forward. Plaintiffs argue that Evans knew or should have known that Suarez was operating his truck in reckless disregard of the known risk of injury or death to other motorists on the interstate, and cite to the following: lack of sufficient conspicuity tape and lack of reflective quality[10] (Doc. 40, 33-34.); that the

---

[10]

Plaintiffs' expert, Mr. Johnson, "found that the reflective tape on the rear of the

Evans policies and procedures regarding pre-trip inspection were inadequate[11] (*Id.* at 35.);
Suarez was without proper endorsements in violation of 49 C.F.R. 383.37[12] (*Id.* at 36.); and
that Suarez had a history of operating his trailer in reckless disregard of the known risk of
harm based on Suarez's Driver Qualification file that showed Suarez received eleven (11)
citations in 2011 with nine (9) issued on one day, two (2) equipment violations in 2008, and
was involved in a motor vehicle accident on September 5, 2005. (*Id.* at 36-38.) Plaintiffs
contend the above demonstrates that Evans knew or should have known that Suarez was
incapable of safely operating a commercial motor vehicle, and such was "outrageous,
intentional, willful, wanton, and/or reckless." (*Id.* at 38, 40.) Evans responds in summary that
"there is absolutely no evidence of any pattern of activity to place Evans on any notice of a
continuing issue with this driver or his equipment and certainly none which would rise to the
level necessary for imposition of punitive damages." (Doc. 42, 9.) The proffered evidence,
standing alone, does not support a claim for punitive damages, however, because there is
a dispute of material fact regarding whether or not Suarez acted on his own or upon advice
of Evans before the accident, the punitive damages claim survives summary judgment and
Evans' motion with regard to this claim will be denied.

        **b.**      **Negligent Entrustment/Hiring and Independent Negligence**

      In addition to vicarious liability claims, Plaintiffs also allege negligent hiring/supervision
and independent negligence claims against Evans in Counts V, VI, VII, and IIX of the

---

chassis was subpar in quality and had little retroreflective properties." (Doc. 40, 33 (citing
Doc. 40-7, 12.))

[11]    Plaintiffs' expert, Mr. Morgan, opines that the pre-trip inspection policies and
procedures at Evans are insufficient and would be unlikely to detect mechanical issues.
(Doc. 40-14, 8.)

[12]    Plaintiff alleges that an inspection after the accident revealed that Suarez was
restricted from operating a motor vehicle with air brakes as reported in the Pennsylvania
State Police Crash Investigation Report. (Doc, 40-14, 11.) However, there is no evidence of
record that Evans' was aware of this.

Amended Complaint. (Doc. 5) Evans contends that because it concedes, for purposes of the pleadings, that Suarez was acting as its employee within the course of his employment, claims of negligent entrustment/hiring should be dismissed as surplusage and that it cannot be held liable for independent corporate negligence due to the concession of vicarious liability. (Doc. 31, ¶¶ 21-24.) Evans cites to this court's decision in *Allen v. Fletcher*, 2009 WL 1542767 (M.D. Pa., June 2, 2009), for the general rule that "courts have dismissed claims for negligent supervision and negligent hiring when a supervisor defendant concedes an agency relationship." *Id.* at *12. Evans also cites to *Mrazik v. Cummings,* No. 2013-02328 (C.C.P. Lebanon Cty, Nov. 18, 2014). (Doc. 32-9) In *Mrazik,* the court states that it "would be pointless to permit simultaneous claims for vicarious liability and negligent hiring/supervision."

Evans argues that if claims of vicarious liability and negligent hiring or supervision are allowed to proceed, "these claims together would permit for the introduction of evidence which could risk undue prejudice at trial." (Doc. 32, 21 (citing *Allen*, 2009 WL 1542767 at *5 (quoting *Holben v. Midwest Emery Freight Sys., Inc.*, 525 F. Supp. 1224, 1224-25 (W.D. Pa. 1981)) ("Nothing can be gained . .  when the defendant employer has admitted the agency of the driver, and to permit the action to proceed on both counts would allow the introduction of evidence of prior accidents of the driver, highly prejudicial, irrelevant and inadmissable in the cause of action based on the imputed negligence of the driver."). Evans also requests summary judgment on Plaintiffs' claims of independent corporate negligence arguing that Plaintiffs cannot seek claims of corporate negligence when the employer concedes the employee was acting within the scope of their employment (Doc. 32, 19-21.), and that the claims are precluded based on this Court's decision in *Allen* and the *Marzik* decision. (*Id.* at 20.)

Plaintiffs contend that even if their punitive damages claims were no longer viable, they would still be able to bring concurrent claims for vicarious liability and negligent entrustment/hiring. (Doc. 40, 41.) Plaintiffs cite to *Scampone v. Highland Park Care Center*, 618 Pa. 363 (Pa. 2012), which states, under Pennsylvania law, that "as a general

proposition, the recognition that a corporation acts through its agents has not been held to be a fatal impediment to haling a corporation into court on direct liability tort claims." *Id.* at 390. Evans counters that reliance on *Scampone* is inappropriate because, in Evans' view, the theory of liability in *Scampone* was premises liability, which it avers is different from the current case because "it is the direct negligence of the employee which has brought Defendant Evans into this litigation . . ." (Doc. 42, 10.)

As both *Allen* and *Mrazik* make clear, "there is an exception to the general rule" regarding concurrent claims against the employee and the employer and "when punitive damages are sought, the hiring and supervision practices of the employer can be evaluated during discovery." *See Allen*, 2009 WL 1542767 at *13 n.5. The current case is distinguishable from both cases. Currently, Plaintiffs allege negligent conduct on behalf of Suarez, but also separately allege negligent conduct on the part of Evans. (*Am. Compl.,* Counts V, VI, VII, IIX.) In *Allen*, the plaintiff did not bring a claim for punitive damages against the employer. The *Mrazik* court specifically stated that because the "[c]omplaint includes no claim for punitive damages," the claims of liability were the same against the employee and employer. *Id.* at 5. Plaintiffs allege that Evans was independently negligent in several ways and raise punitive damages claims. *See Am. Compl.* at ¶¶ 62-63, 76-77) ("The accident was due solely to the negligent conduct, careless conduct, and gross, wanton and reckless conduct of Defendant Evans. . .by and through its agents, servants, workmen and employees, including but not limited to, Wilfredo Suarez.").

Courts have stated that "where in a negligent entrustment case the plaintiff alleges that defendant's action [were] indifferent to the consequences and claims punitive damages, this becomes an important additional element to his case." *Holben*, 525 F. Supp. at 1225. Additionally, the Pennsylvania Superior Court has recognized that "an employer [has] the duty to exercise reasonable care in selecting and controlling employees." *TransAm,* 605 F. Supp. 2d at 657 (citing Restatement (Second) of Agency § 213 (1958); *Brezenski v. World Truck Transfer, Inc.,* 755 A.2d 36, 42 (Pa.Super. 2000)). In relevant part, Restatement

(Second) of Agency § 213 (1958), provides:

> A person conducting an activity through servants or other agents is subject to liability for harm resulting from his conduct if he is negligent or reckless:
>
> ...
>
> (b) in the employment of improper person or instrumentality in work involving risk of harm to others:
>
> (c) in the supervision of the activity;
>
> (d) or in permitting, or failing to prevent, negligent or other tortious conduct by persons, whether or not his servants or agents, ... with instrumentalities under his control.

The issue remains whether Evans was independently negligent as alleged by Plaintiffs in Counts V, VI, VII, and IIIX. *(Am. Compl.)*  Similarly to the factual scenario in *TransAm*, Plaintiffs will attempt to introduce evidence of Evans' own improper actions, and the claims for punitive damages are not based solely on negligent entrustment or hiring. 605 F. Supp. 2d at 685; *see also Calhoun v. Van Loon*, 2014 WL 3428876, *5 (M.D.Pa., July 11, 2014) ("Our ruling would likely be different had the record shown evidence that would support a claim for negligent entrustment, training, hiring, retention, and supervision, based on the actions or omissions of [defendant] other than those attributed to it under the doctrine of *respondeat superior* which are also the actions or omissions of Defendant [driver] in this case.") Therefore, because summary judgment on Plaintiffs' claims for punitive damages is inappropriate at this time and Plaintiffs have sought to hold Evans independently liable, so to is summary judgment on Plaintiffs' claims for negligent hiring/supervision and independent corporate negligence against Evans.

### B.    Trac's Motion for Summary Judgment

Trac moves for summary judgment on Plaintiffs' claims against it. (Doc. 33) As stated by Trac, Plaintiffs assert claims of vicarious liability for Suarez's alleged negligence, negligent supervision of Suarez, and for providing a defective chassis to Suarez in violation of the Federal Motor Carrier Safety Regulations. (*Id.* at 17.) Trac argues that Plaintiffs' claims are barred by the Graves Amendment, 49 U.S.C.A. § 30106, or, in the alternative, that "there

is simply no evidence to show that this particular chassis was negligently maintained and/or that it was not roadable when it left the terminal under the exclusive control of Evans Transportation." (*Id.* at 24.)

Trac argues all of the statutory requirements are met for application of the Graves Amendment, therefore, any potential liability, on its part, under state law is preempted, thus summary judgment is appropriate. (Doc. 33, 19.) The Graves Amendment "is designed to protect businesses that lease motor vehicles, more akin to commercial lenders/rental companies, rather than trucking companies that happen to occasionally sell or lease motor vehicles." *Shropshire v. Shaneyfelt*, 2013 WL 3666353, at *5 (W.D. Pa. July 12, 2013) (citing *Carton v. General Motors Acceptance Corp.,* 639 F.Supp.2d 982 (N.D.Iowa 2009).The Amendment, in relevant part, states the following:

> **(a) In general.**--An owner of a motor vehicle that rents or leases the vehicle to a person (or an affiliate of the owner) shall not be liable under the law of any State or political subdivision thereof, by reason of being the owner of the vehicle (or an affiliate of the owner), for harm to persons or property that results or arises out of the use, operation, or possession of the vehicle during the period of the rental or lease, if--
>
> **(1)** the owner (or an affiliate of the owner) is engaged in the trade or business of renting or leasing motor vehicles; and
>
> **(2)** there is no negligence or criminal wrongdoing on the part of the owner (or an affiliate of the owner).

49 U.S.C.A. § 30106. Plaintiffs argue that Trac is not entitled to relief from liability based on allegations of its own corporate negligence. (Doc. 38, 13.) Because allegations of negligence on the part of an entity covered by the Graves Amendment impacts applicability, it is prudent to first assess whether Plaintiffs have come forward with evidence to permit a reasonable jury to find in their favor on their claims of negligence against Trac.

The parties do not contest that the tractor, owned by Suarez, while working as an employee of Evans, was hauling a chassis[13] which Evans had leased and/or interchanged

---

[13]

"Intermodal equipment means trailing equipment that is used in the intermodal transportation of containers over public highways in interstate commerce, including trailers

from Trac. (Doc. 33, 6-7 ¶¶ 2-3.) The parties also agree that Trac is in the business of leasing intermodal transportation equipment, and Evans' use of Trac's chassis was subject to the terms of the Equipment Interchange Agreement ("EIA"). (*Id.* at ¶¶ 1, 4; Doc. 33-4.) The EIA provides that the motor carrier or its representative, in this case, Evans, is to inspect a chassis to ensure it complies with the applicable regulations.[14] (Doc. 33, ¶ 9.) The parties further do not contest the authenticity of the EIA, however, Plaintiffs and Trac dispute what the terms mean in the current case.

Trac argues that the federal regulations require a driver to perform a pre-trip

---

and chassis." 49 C.F.R. § 390.5.

[14]   The subject language of the EIA is as follows:

**ACCEPTANCE OF CHASSIS.** Motor Carrier (or its representative) shall have the opportunity at the Pool Locations to inspect and accept or reject each Chassis that Lessor tenders for delivery hereunder. Motor Carrier (or its representative) shall reject any Chassis that, at the time of such tender of delivery (I) is not in roadable and good operating condition or (ii) does not comply with applicable laws, rules, regulations and standards of the Federal Motor Carrier Safety Administration ("FMCSA") of the United States Department of Transportation ("DOT") and the applicable pre-trip inspection guidelines of the Uniform Intermodal Interchange & Facilities Access Agreement ("UIIA"). If Motor Carrier rejects a Chassis tendered for delivery hereunder because such Chassis is not in compliance with either (I) or (ii), above, it shall promptly notify Lessor (or its representative) and Lessor (or its representative) shall either have the Chassis repaired so that it is in compliance , or tender a different Chassis to Motor Carrier for its inspection and acceptance or rejection, as aforesaid. Upon acceptance of a Chassis, Lessor (or its representative) shall issue an Equipment Interchange Receipt or similar document, which may be in electronic form (an "EIR"), evidencing Motor Carrier's (or its representative's) acceptance of delivery of such Chassis. Motor Carrier (or its representative) shall note any damage to the Chassis existing at the time of Motor Carrier's acceptance of the EIR. Motor Carrier's acceptance of any Chassis so tendered by Lessor shall constitute conclusive evidence of receipt by Motor Carrier of such Chassis for all purposes of this agreement, and be deemed an acknowledgment that such Chassis is in roadable and good operating condition as set out in (I), above, and complies with applicable laws, rules, regulations and standards as set out in (ii) above. Upon Motor Carrier's (or its representative's) acceptance of a Chassis, all terms and conditions of this Agreement shall apply to such Chassis. Each Chassis accepted and On-Hired by Motor Carrier hereunder shall at all times remain the sole and exclusive property of Lessor and Motor Carrier shall acquire no ownership rights of any nature in any such Chassis by virtue of paying rental charges or otherwise. (Doc. 33-4, 1-2.)

inspection of any intermodal equipment to ensure that the components are in good working order, before operating the equipment over the road. (Doc. 33, 20 (citing 49 C.F.R. §§ 309.42(a); 392.7(b)). And "[d]rivers who operate the equipment over the road shall be deemed to have confirmed the . . . components were in good working order when the driver accepted the equipment." 49 C.F.R. § 392.7. Therefore, in the current case, based on the EIA, the Evans representative was required to ensure that the selected chassis was roadable, (Doc. 33, 27; Doc. 33-4, 1-2.); *see supra* text accompanying note 15, and, by accepting the chassis, confirmed the chassis was in good operating condition. (Doc. 33, 22.) Trac avers that, although it do not admit such for trial, for purposes of this motion, I can assume that the "death of [Plaintiffs' decedent] was caused by the chassis' (sic) lack of lights and reflective tape at the time of the accident." (Doc. 33, 19.) Notwithstanding, Trac argues that there is "no evidence to suggest that the chassis was not in good working condition when it was interchanged to Evans on April 5, 2013." (*Id.*)

Plaintiffs argue that summary judgment is not appropriate because genuine issues of material fact exist as to whether Trac retained a duty to repair and maintain the subject chassis, and that there is evidence that Trac breached its duty. (Doc. 38, 15.) Plaintiffs argue broadly that Trac was required to "systematically inspect, repair, and maintain [the chassis], or cause to [be] systematically inspected, repaired, and maintained, in a manner consistent with" 49 C.F.R. § 396.3.[15] (Doc. 38, 12.) And that the regulations require that all lamps, hazard signals, reflective devices, electrical wiring, and tires are in good condition. (*Id.* at 14.) Plaintiffs set forth that because the wiring on the chassis was changed prior to the accident

---

[15]

(a) General. Every motor carrier and intermodal equipment provider must systematically inspect, repair, and maintain, or cause to be systematically inspected, repaired, and maintained, all motor vehicles and intermodal equipment subject to its control.

   (1) Parts and accessories shall be in safe and proper operating condition at all times.

   These include those specified in part 393 of this subchapter and any additional parts and accessories which may affect safety of operation, including but not limited to, frame and frame assemblies, suspension systems, axles and attaching parts, wheels and rims, and steering systems.

49 C.F.R. § 396.3.

(citing Doc. 38-10, 61.); because an inspection of the chassis after the accident by their expert, Mr. Johnson, revealed electrical deficiencies; and because there was insufficient conspicuity tape on the chassis following the accident, these defects were a direct cause in Mr. Holder's death.  (Doc. 38, 16-18.) Plaintiffs also rely heavily on a portion of the language from the EIA that states Trac will repair or replace the chassis "so that it is in compliance" with all applicable laws, rules, regulations, and standards." (*Id.* at 14 (citing Doc. 38-11)); *see supra* text accompanying notes 14-15.

Trac relies on an unpublished opinion of this district that holds that the imposition, under Pennsylvania law, to a lessor of a non-delegable duty of care to assure that leased vehicles are in proper operating condition, is another way of imposing vicarious liability on a vehicle lessor based solely upon ownership; specifically what the Graves Amendment is meant to prevent. *Buzzerd v. Flagship Carwash of Port St. Lucie, Inc.,* Civ. No. 3:06-9081, *5 (M.D.Pa. Sept. 28, 2009) (Vanaskie, J.) (Doc. 33-21, 1-8.). The court stated that it is only when the owner retains a duty of maintenance and repair would the savings clause of the Graves Amendment be triggered. *Id.* at *6. The current case differs from *Buzzerd* in that Trac maintained a duty of maintenance and repair. *Buzzerd* is distinguishable because was no evidence in *Buzzerd* that the defendant owed a duty to the plaintiff. I agree with Plaintiffs that the Graves Amendment is "inapplicable to release the Lessor of liability for its own negligent conduct in failing to adequately maintain and repair its equipment." (Doc. 31, 20.) However, such does not preclude application of the Graves Amendment if the evidence does not support a negligence claim against Trac.

Trac had a duty to maintain the chassis, even if done through representatives. There is no genuine issue as to that fact. However, the more important question is whether or not there is any evidence that demonstrates a breach of that duty that led to the accident and the subsequent death of the Plaintiffs' decedent. Under Pennsylvania law, "[l]essors and owners of motor vehicles may be liable for personal injuries suffered by third parties because of defects in the vehicles." *Evans v. Goldfine Truck Rental Serv. Co.*, 361 A.2d 643, 649 (Pa.Super. 1976) (citing *Delair v. McAdoo*, 324 Pa. 392, 188 A. 181 (1936); *Trusty v.*

*Patterson*, 299 Pa. 469, 149 A. 717 (1930))(citations omitted).  But, "their duty is limited to defects known or discoverable by reasonable inspection." *Id.* In support of their contention that issues of fact are in dispute, Plaintiffs rely on two of their expert opinions. The experts state that an inspection, following the accident, revealed the chassis had electrical deficiencies (Doc. 38-5, 11.), and insufficient conspicuity tape (*Id.* at 12-13; Doc. 38-13, 16.). (Doc 38, 16-17.) Plaintiffs also state that Trac was required to have a process to receive driver reports of defects under 49 C.F.R,. § 396.11, and because Mr. Morgan opines that the chassis was in "out-of service" condition at the time of the accident, Trac, by implication, breached its duty. (Doc. 38, 18; Doc. 38-13, 17.) Further, Plaintiffs rely on deposition testimony from Mr. George Braun, a mechanical engineer and Trac advisor, who states that the chassis lacked proper conspicuity tape. (Doc. 38, 17; Doc. 38-1, 61-62.)

In response, Trac calls attention to Plaintiffs' expert, Dr. Christopher Shapley who states the following: "[d]uring the inspection of the accident trailer, it was connected to another truck and the lights checked. It was noted that the rear lights worked, indicating that there had been no damage to the wiring from the front of the trailer to the rear lights." (Doc. 40-8, 3.) Also arguing that Plaintiffs may seek to hold it "liable for negligence (sic) inspection and/or maintenance by its repair vendors, or the mechanics at Global Terminal,"(Doc. 33, 13-14.) Trac argues such is not appropriate because the Global Terminal staff are not its affiliates, as defined by the Graves Amendment to be:

> (1) Affiliate.--The term "affiliate" means a person other than the owner that directly or indirectly controls, is controlled by, or is under common control with the owner. In the preceding sentence, the term "control" means the power to direct the management and policies of a person whether through ownership of voting securities or otherwise.

49 U.S.C.A. § 30106. As Mr. Kennedy, Trac's  senior manager of operations, testified, Trac has no control over the mechanics and the terminal employees who perform inspections.[16]

---

[16]
> Mr. Munley: But there's nobody from TRAC at the outbound gate inspecting the chassis, correct?
> Mr. Kennedy: Correct. We are not allowed because it's ILA mechanics.

(Doc. 33-7, 41.) It is uncontested that on April 5, 2013, Evans sent a representative to the location where Trac's chassis was selected, (Doc. 33, 6-7 ¶ 5.) and the Equipment Interchange Report states that there was no reported damage to the chassis upon leaving the yard, driven by the Evans' representative. (Doc. 33-5) The EIA makes clear that the motor carrier, or their representative, is to notify Trac if a defect exists. There's no evidence that Trac was notified of a defect on April 5, 2013. There is no evidence it knew of any defects with the chassis on the date it was interchanged with Evans. Plaintiffs' reliance on language in the EIA mandating Trac to maintain the chassis appropriately, fails to take into consideration the language preceding that this duty arose upon notification of a defect. There is no proof of notification in this case. The evidence of record does not support Plaintiffs' claims. In fact, Mr. Kennedy, testified that "[t]here is a yearly inspection" done on the chassis. (Doc. 33-7, 25.) And, viewing the testimony of Mr. Braun more fully, he states that he could not say what the condition of the chassis was prior to the accident. (Doc. 38-12, 61-62.) ("It's –it's very difficult to say if –if it was okay before the accident, . . ."). There is no evidence of record that challenges that the chassis was not roadable when inspected on April 5, 2013 when the chassis left Global Terminal, nor that the inspections were not reasonable.

Because there is no evidence that Trac breached its duty, there is no genuine issue of material fact regarding its alleged negligence. There is no evidence in this case that Trac was negligent in maintenance of the chassis. Plaintiffs have failed to present any evidence to demonstrate a genuine issue of material fact regarding the condition of the chassis when it left the control of Trac and Evans assumed control. Therefore, the Graves Amendment is applicable. Trac's motion for summary judgment will be granted.

### III. Conclusion

For the above stated reasons, Defendants Wilfredo Suarez, individually; Wilfredo Suarez d/b/a Suarez Trucking, LLC; Evans Delivery Company, Inc.; and Evans Delivery

---

Mr. Munley: You have to rely on the ILA mechanics, correct?
Mr. Kennedy: Yes, sir.
(Doc. 33-7, 41.)

Company, Inc. d/b/a All Points Transportation's Motion for Partial Summary Judgment (Doc. 31) will be denied. Defendant, Interpool Inc., d/b/a Trac Intermodal's Motion for Summary Judgment (Doc. 33) will be granted.

An appropriate order follows.


 February 12, 2016                                    /s/ A. Richard Caputo
Date                                                 A. Richard Caputo
                                                     United States District Judge

31